**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
IVELISSE CLAUSELL,

       Plaintiff,

  -against-              Case No.: 25-cv-1751

JOHNSON & JOHNSON,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**


Dated: New York, New York
   July 21, 2025


            **MESIDOR PLLC**
            Crystal Pettiford, Esq.
            *Attorneys for Plaintiff*
            110 E 25th St
            New York, NY 10010
            (315) 847-5174

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1
STATEMENT OF FACTS ........................................................................................................... 1
STANDARD OF REVIEW .......................................................................................................... 6
ARGUMENT ................................................................................................................................. 6
   I.    DISCRIMINATION CLAIMS ........................................................................................ 6
   II.   RETALIATION CLAIMS ............................................................................................... 9
CONCLUSION ........................................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540 (2025) ........................................................... 7

*Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016).............................................. 6, 7, 10

*Dzwonar v. McDevitt*, 177 N.J. 451 (2003) ..................................................................................... 9

*Greenman v. City of Hackensack*, No. 15-cv-3274, 2016 WL 831794 (D.N.J. Mar. 2, 2016)..... 12

*Griffin v. Metromedia Energy, Inc.*, No. 10-cv-3739, 2011 WL 12872504 (D.N.J. Feb. 7, 2011) ........................................................................................................................................... 12

*Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89 (1990) .................................................................... 7

*Hussain v. Allies, Inc.*, No. A-1532-23, 2025 WL 1156055 (N.J. Super. Ct., App. Div. Apr. 21, 2025)............................................................................................................................ 11, 12

*Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101 (3d Cir. 1997)................................................. 7

*Maimone v. City of Atlantic City*, 188 N.J. 221 (2006) .................................................................. 9

*Mayer v. Belichick*, 605 F.3d 223 (3d Cir. 2010) ........................................................................... 6

*McDonnell-Douglas v. Green*, 411 U.S. 792 (1973) ...................................................................... 8

*Meyers v. Board of Educ.*, No. 07-cv-5058, 2010 WL 4387503 (D.N.J. Oct. 29, 2010) ....... 12, 13

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993) ............... 9

*Phillips v. City of Allegheny*, 515 F.3d 224 (3d Cir. 2008)............................................................. 6

*Richter v. Oakland Bd. of Educ.*, 246 N.J. 507 (2021) ................................................................... 7

*Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486 (3d Cir. 1999)..................................................... 7

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003 (N.D. Cal. 2024) ..................... 8

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)........................................................................ 6

*Tartaglia v. UBS PaineWebber Inc.*, 197 N.J. 81 (2008) ......................................................... 9, 13

*Texas Dept' of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ...................................................... 7

*Trzaska v. L'Oreal USA, Inc.*, 865 F.3d 155 (3d Cir. 2017)................................................. 9, 11, 13

**Statutes**

18 U.S.C. § 1839................................................................................................................................ 9

N.J.S.A. § 56:15-2............................................................................................................................. 9

N.J.S.A. 34:19-2................................................................................................................................ 9

N.J.S.A. 34:19-3................................................................................................................................ 9

**Other Authorities**

N. Jerermi Duru, *The Fritz Pollard Alliance, the Rooney Rule, and the Quest to "Level the Playing Field" in the National Football League*, 7 Va. Sports & Ent. L.J. 179 (2008) ............. 8

**PRELIMINARY STATEMENT**

Plaintiff, Ivelisse Clausell, ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendant, Johnson & Johnson's, ("Defendant") motion to dismiss Plaintiff's claims of race discrimination under 42 U.S.C. § 1981 ("Section 1981"), race and gender discrimination under the New Jersey Law Against Discrimination ("NJLAD"), retaliation under the New Jersey Conscientious Employee Protection Act ("CEPA") and retaliation under the New Jersey common law "Pierce Doctrine" ("*Pierce*").

Defendant's motion fails to materially address the substance of Plaintiff's claims. Defendant's argument on Plaintiff's discrimination claims centers on the rigid application of a test long held by controlling law to be flexible and inapplicable on a motion to dismiss. On Plaintiff's retaliation claims, Defendant likewise devotes its time to demanding detailed factual allegations far beyond what is necessary at the pleading stage. As discussed further below, when interpreted in line with the proper legal standards, there is no merit to Defendant's motion.

**STATEMENT OF FACTS**

Plaintiff, a female Latina, initially started working for Defendant in April 2016 as a Senior Counsel in Privacy Law. (Am. Compl. ¶ 16). Despite the fact that Defendant provided Plaintiff with insufficient resources for her role, Plaintiff was extremely successful, receiving a review score of "Exceeds" in recognition of her substantial contributions to establishing and enhancing Defendant's privacy program. (Am. Compl. ¶ 19). In December 2019, Plaintiff left Defendant's employ and from January 2021 to January 2022, she worked as Chief Privacy Officer for Organon & Co. (Am. Compl. ¶ 20).

In January 2022, Plaintiff returned to Defendant as Group Leader, Global Privacy & Cyber Security Law, at the request of the then General Counsel of Defendant. (Am. Compl. ¶ 22-23). One year later, Plaintiff was made Vice President Data Protection Law. (Am. Compl. ¶ 23). After

1

rejoining Defendant, Plaintiff continued her run of exceptional performance, receiving numerous Inspire Awards from Defendant. (Am. Compl. ¶ 25). Plaintiff also received a score of "Strong/Exceptional" on her 2022 year-end review and "Strong" on her 2023 year-end review, with a commendation as "an amazing Privacy expert." (*Id.*). Plaintiff was additionally recognized by professional organizations outside of Defendant. In 2023, Plaintiff was awarded the Council of Urban Professionals Law Catalysts Award, in May 2024, Plaintiff was featured in the Hispanic Executive Magazine's "Legal Luminaries" series and, in November 2024, Plaintiff was honored with the Lucero Award by LatinoJustic PRLDEF. (Am. Compl. ¶ 26). Plaintiff further holds the distinction of being a Fellow in Information Privacy, a distinction given only to privacy practitioners who have demonstrated excellence in the field, hold at least one privacy credential (Plaintiff has four) and who are recommended by at least three experienced privacy professionals. (*Id.*).

In the Summer of 2023, the then Chief Privacy Officer at Defendant declared his intention to retire in September 2023 and advised that Defendant sought to fill his role prior to his departure. (Am. Compl. ¶ 31). Ashley Watson ("Watson"), a white woman and Worldwide VP and General Counsel, MedTech Legal and Head of Enterprise Privacy, was appointed as hiring manager for the Chief Privacy Officer position. (*Id.*). Watson announced she was looking for three things for a successful candidate to the Chief Privacy Officer position: (1) someone who was a privacy expert, (2) someone who had done the job before and (3) someone who was "delightful." (Am. Compl. ¶ 32).

Plaintiff amply met each of the three requirements expressed by Watson. Plaintiff had practiced privacy law for more than 15 years, had frequently been asked to speak on privacy topics and, as discussed above, had numerous certifications and achievements in the privacy area. (Am.

2

Compl. ¶ 34). Plaintiff had also led global privacy programs at several organizations, working as the Global Head of Privacy & Information Security at Esperion Therapeutics and Senior Compliance Counsel & Privacy Officer at Otsuka Pharmaceutical, in addition to serving as Chief Privacy Officer at Organon. (*Id.*). Lastly, Plaintiff had received a rating of "Exceeds" in the "Behaviors" section of her then most recent performance evaluation and was praised by Defendant for her reputation as an "extremely collaborative" employee in release announcing her appointment as Group Leader, Global Privacy & Cybersecurity Law, demonstrating that Defendant found her "delightful" in the work environment. (*Id.*).

Despite Plaintiff's clear qualifications for the role, Defendant refused to afford Plaintiff a fair opportunity for consideration, conducting a farcical interview process throughout July 2023, when the white leadership team already knew it would hire Scott Taylor ("Taylor"), an external white male candidate, regardless of his performance in interviews compared to other applicants. (Am. Compl. ¶¶ 35, 37). On July 5, 2023, Watson conducted a sham interview of Plaintiff, telling Plaintiff, before Plaintiff even had an opportunity to set forth her qualifications, that she preferred the white male applicant, Taylor. (Am. Compl. ¶ 38). Plaintiff's other two interviews, on July 10, 2025 went similarly, with Denise Weber, Head of Human Resources, Legal & Government Affairs, acknowledging Watson's pre-decision in favor of Taylor. (Am. Compl. ¶ 39). On July 21, 2023, Watson informed Plaintiff that Defendant was hiring Taylor as Chief Privacy Officer. (Am. Compl. ¶ 40). This came as a shock to many of Plaintiff's colleagues, who considered her to be the "best" in privacy at Defendant. (Am. Compl. ¶ 36).

Soon after Taylor began his employment with Defendant, Plaintiff became concerned that Taylor was misappropriating trade secrets from his former employer, Merck & Co. ("Merck"), as Taylor was copying and pasting confidential work products and information from Merck branded

3

documents into documents and presentations with Defendant's branding. (Am. Compl. ¶ 44). The documents that Taylor misappropriated included Merck's Privacy Rulebook, Privacy Functional Deployment Stands, other associated policies and standards and copies of entire presentation decks, which included therein proprietary information belonging to Merck. (*Id.*). Over the course of the Fall of 2023, Taylor gave several internal presentations expressly containing slides and information taken from Merck. (Am. Compl. ¶ 45). In late November or early December 2023, Taylor admitted to Plaintiff during a meeting that he was in possession of "the whole Privacy Rulebook" from Merck. (Am. Compl. ¶ 46). Plaintiff informed Taylor that she did not believe he should have the Merck Privacy Rulebook, but Taylor pushed back and continued to use Merck's property to perform his work for Defendant. (*Id.*).

On December 26, 2023, Taylor hired Raymond Farraro ("Farraro"), who he had previously supervised at Merck, for the position of Senior Director, Global Privacy Governance & Assurance. (Am. Compl. ¶¶ 47-48). Upon commencing his employment, Farraro likewise converted several Merck documents, changing the color and branding on the documents from Merck to Defendant. (Am. Compl. ¶ 49). On several occasions, Farraro openly admitted to converting the documents from Merck and he instructed employees simply to alter any references to Merck to Defendant. (*Id.*).

Concerned that Taylor and Farraro's conduct violated several intellectual property laws, including the Defend Trade Secrets Act and the New Jersey Trade Secrets Act, Plaintiff spoke with Weber about her concerns on May 14, 2024. (Am. Compl. ¶¶ 43, 50, 52). On May 17, 2024, Plaintiff made a formal complaint to ensure that Defendant complied with the law, noting that Taylor and Fararro had brought proprietary documents from Merck, which Plaintiff believed contained intellectual property belonging to Merck, particularly as those documents repeatedly

4

referred to Merck's internal data and contained references to divisions that did not exist at Defendant. (Am. Compl. ¶ 52). Although Plaintiff continued to supply additional support for her complaint after May 2024, Weber did not submit Plaintiff's complaint until June 19, 2024. (Am. Compl. ¶¶ 54-55).

One week later, on June 26, 2024, Plaintiff had her mid-year performance review with Taylor and Watson, whose attendance came as a surprise to Plaintiff. (Am. Compl. ¶ 57). During the meeting, Taylor and Watson provided Plaintiff with negative performance feedback, which stood in strong contrast to her previously exceptional reviews. (Am. Compl. ¶ 58). The review was replete with preposterous characterizations, critiquing Plaintiff for work for which she was not responsible and for tasks she had already addressed, as well as criticizing her as "disengaged" and failing to support the regional leaders on the team, even though she had received consistent feedback from her colleagues that she was an outstanding leader. (Am. Compl. ¶¶ 59, 61). Taylor and Watson even admitted that the feedback from business leaders and partners regarding Plaintiff's work was excellent. (Am. Compl. ¶ 60). However, they insisted that negative "perceptions" from "certain members" of the Global Privacy team was determinative of her overall performance. (*Id.*). During the meeting, Taylor and Watson also informed Plaintiff that Defendant was eliminating her position, with an ultimate effective date of December 27, 2024. (Am. Compl. ¶¶ 62, 64).

On September 30, 2024, Defendant provided Plaintiff with the results of its investigation into her complaint. (Am. Compl. ¶ 65). Despite confirming that materials belonging to Merck were used, Defendant concluded that their usage was not improper. (*Id.*). On October 24, 2024, Defendant published a new organizational chart for Plaintiff's team, with Plaintiff conspicuously absent. (Am. Compl. ¶ 66). After learning of Plaintiff's termination, numerous colleagues,

5

including members of the North American DEI Council, contacted Plaintiff to express their shock and disappointment as well as to express their gratitude for her contributions to Defendant. (Am. Compl. ¶¶ 66-67). On February 20, 2025, Defendant reduced Plaintiff's annual bonus by 50%, without any explanation. (Am. Compl. ¶ 68).

## STANDARD OF REVIEW

On a motion to dismiss, a court "must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). Detailed factual pleading is not required and "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove [the allegations] or will ultimately prevail on the merits." *Phillips v. City of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). Rather, assuming all factual allegations as true and drawing all reasonable inferences therefrom, Plaintiff only has to demonstrate a right to relief above the speculative level. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016); *Mayer*, 605 F.3d at 229.

## ARGUMENT

**I.    DISCRIMINATION CLAIMS**

Citing one variation of the *prima facie* elements of the *McDonnell-Douglas* burden shifting framework, Defendant argues that Plaintiff has not pled that she was similarly or more qualified than Taylor. However, there is no such requirement. The *McDonnell-Douglas* framework "is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002); *see also id.* at 512 ("Given that the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination

6

cases.").[1] Moreover, even at later stages, the Supreme Court has repeatedly emphasized, and only mere months ago reiterated, that strict adherence to the *prima facie* elements is not necessary. *See Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1546 (2025).[2]

Rather, at the pleading stage, all that is necessary is to plead facts to raise a reasonable expectation that discovery will reveal evidence of an inference of discrimination. *See Connelly*, 809 F.3d at 789. As discrimination is rarely obvious, and often insidious, the burden is not meant to be a heavy one. *See Texas Dept' of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981). In certain circumstances, it is as simple as showing replacement by someone outside the protected class. *See e.g. Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). Ultimately, because the elements of a discrimination case can vary based on context, *See Ames*, 145 S. Ct. at 1546 (quoting *Swierkiewicz*, 534 U.S. at 512), an employee is free to argue that any set of circumstances can show an inference of discrimination. Indeed, in *Ames*, the Supreme Court noted that a plaintiff could satisfy the first step of the *McDonnell-Douglas* test, which again is greater showing than what is required at the pleading stage, "simply by presenting evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 1545 (internal quotations omitted).

Here, Plaintiff posits her application and interview process demonstrate just such an inference. Specifically, despite amply meeting all of the requirements of the Chief Privacy Officer role, making her within the confines of the job requirements at least as qualified as anyone else,

---

[1] Although *Swierkiewicz* addressed Title VII, "the elements of employment discrimination under Title VII are identical to the elements of a [S]ection 1981 claim." *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999).
[2] Plaintiff's claims under the NJLAD are governed by the same standards. *See Richter v. Oakland Bd. of Educ.*, 246 N.J. 507, 527 (2021) (noting that "[i]t has proven advantageous to harmonize, to the extent possible, the [NJLAD's] development with Title VII's development"); *Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89, 98 (1990) (noting that the New Jersey Supreme Court "has never embraced the *McDonnell Douglas* test literally, invariably, or inflexibly").

Defendant did not give her any actual consideration. (Am. Compl. ¶¶ 34-39). Instead, Defendant conducted a sham interview, (Am. Compl. ¶¶ 38-39), a common discriminatory response to minority candidates in some industries. *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1020 (N.D. Cal. 2024); N. Jerermi Duru, *The Fritz Pollard Alliance, the Rooney Rule, and the Quest to "Level the Playing Field" in the National Football League*, 7 Va. Sports & Ent. L.J. 179 (2008).

In this regard, Plaintiff's evidence is simply the same reasoning that underlies the inference used in *McDonnell-Douglas* itself. In that case, the inference was shown by demonstrating that the employer continued to seek applicants after denying a position to the plaintiff, *see McDonnell-Douglas v. Green*, 411 U.S. 792, 802 (1973), the evident underlying reason being that by not hiring a candidate who met the qualifications of the job, the employer demonstrated that an impermissible consideration, such as race, was likely at issue.

Plaintiff's allegations show the same considerations, just in a different temporal context. At the outset, Defendant pre-decided that it would not consider Plaintiff even though she met all the qualifications for the role, thereby demonstrating at the beginning of the job search process, as opposed to the end, that the legitimate qualifications for the position were not the true measure and that some impermissible measure, such as race or gender, likely motivated the decision to deny her a promotion. Thus, Plaintiff submits that her allegations are sufficient for her discrimination claims to survive a motion to dismiss.[3]

---

[3] Defendant presents a separate argument concerning Plaintiff's assertions that she was subjected to differential performance standards and pushed out of her job on the basis of her race and gender. However, these are not discrete claims. They represent additional post-hoc evidence of the discriminatory environment at Defendant. Specifically, that when Plaintiff called out illegal and unethical practices maintained by Defendant's white male employees, Plaintiff, and not the white male employees, suffered in the punishment in the form of falsified review and termination.

## II.   RETALIATION CLAIMS

To establish a claim under the CEPA, a plaintiff "must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a 'whistle-blowing' activity described in N.J.S.A. 34:19-3[]; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action." *Dzwonar v. McDevitt*, 177 N.J. 451, 464 (2003).  Defendant challenges only[4] the first element,[5] that Plaintiff reasonably believed Defendant was violating the Defend Trade Secrets Act and the New Jersey Trade Secrets Act, both of which make it unlawful to misappropriate[6] a trade secret.[7]  *See* 18 U.S.C. § 1836; N.J.S.A. § 56:15-2.  As this is a motion to dismiss, Plaintiff need only plead enough facts, together with all reasonable inferences therefrom, that discovery will reveal evidence she had a reasonable belief these laws were violated. *See Trzaska v. L'Oreal USA, Inc.*, 865 F.3d 155, 162 (3d Cir. 2017).[8]

---

[4] Defendant also makes the argument that an email sent on May 22, 2024 conclusively demonstrates that Plaintiff could not have reasonably believed any conduct was illegal. (Rosenblatt Decl. Ex. 1).  There are numerous issues with Defendant's position.  First, the Court cannot consider the email because Plaintiff's complaint does not rely on it.  *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  The Amended Complaint does not make any reference to an email on May 22, 2024 and instead relies on complaints made on May 14, 2024 and May 17, 2024.  (Am. Compl. ¶ 52).  Second, there is no indication at the end of the email who it is from and Defendant redacted the from line of the email in its submission to the Court.  Moreover, the submitted email contains no clickable link to test the veracity of Defendant's assertion it is a public YouTube presentation.  Third, and finally, the email itself says that it is "[f]urther to our conversation on Friday," demonstrating that, even accepting all of Defendant's representations, there was more to Plaintiff's complaint than this email.

[5] The other elements are beyond dispute.  Plaintiff made a formal complaint to Defendant, satisfying the second element, *see* N.J.S.A. 34:19-3(a)(1), (c)(1), was terminated, undoubtedly an adverse employment action, *see* N.J.S.A. 34:19-2(e), and Defendant terminated Plaintiff's employment one week after the submission of her complaint, well within the temporal proximity necessary to plead causation.  *See Maimone v. City of Atlantic City*, 188 N.J. 221, 237 (2006) (finding that two-week period could support an inference of causation at trial).

[6] Misappropriate is defined as the use or disclosure of a trade secret acquired by improper means, which includes the breach of a duty to maintain the secrecy of the trade secret.  18 U.S.C. § 1839; N.J.S.A. § 56:15-2.

[7] Trade secret is defined as all forms of tangible or intangible property with independent economic value that the owner has taken reasonable measures to keep secret.  18 U.S.C. § 1839; N.J.S.A. § 56:15-2.

[8] In a footnote, Defendant argues that Plaintiff should be held to a higher standard because she is an attorney.  However, in *Trzaska*, the Third Circuit expressly rejected that argument in the context of a motion to dismiss.  865 F.3d at 155 n. 4.  Moreover, the case on which Defendant relies, *Tartaglia v. UBS PaineWebber Inc.*, 197 N.J. 81 (2008) addressed

Eschewing an attempt to argue this standard, Defendant, without offering any support for its contention, simply dismisses Plaintiff's allegations as a conclusory. However, the allegations in the Amended Complaint are nothing of the sort. A conclusory allegation is a mere formulaic recitation of a legal standard. *See Connelly*, 809 F.3d at 790 (finding allegations such as defendant "subjected [plaintiff] to disparate treatment based on her gender and retaliation for making complaints about discrimination and sexual harassment" and defendant violated Title VII "by subjecting [plaintiff] to discrimination based on her gender and retaliation" conclusory). Here, by contrast, Plaintiff sets forth a series of concrete allegations of fact.

Shortly after Taylor began his employment with Defendant, Plaintiff discovered that Taylor was using confidential information and documents belonging to his previous employer, Merck, to perform his work with Defendant. (Am. Compl. ¶ 44). Specifically, in addition to other associated policies and standards, Taylor misappropriated Merck's Privacy Rulebook, Privacy Functional Deployment Standards and copies of entire presentation decks, which contained therein proprietary information belonging to Merck. (*Id.*). Indeed, Taylor copied and pasted Merck's confidential work product and rebranded as Defendant's. (*Id.*). Over the course of the fall of 2023, Taylor gave several internal presentations clearly labeled as Merck's property and containing information from Merck. (Am. Compl. ¶ 45). In late November or early December 2023, Taylor admitted to Plaintiff that he was in possession of "the whole Privacy Rulebook" from Merck and Plaintiff immediately replied that she did not believe he should have possession of the Merck Privacy Rulebook. (Am. Compl. ¶ 46).

On December 26, 2023, Taylor hired Farraro, who he formerly supervised at Merck, to work for Defendant. (Am. Compl. ¶ 47). Upon commencing his employment, Farraro furthered

---

terminations in violation of public policy embodied in rules of professional conduct governing lawyers, which is not the case here. *Id.* at 112.

10

the misappropriation of Merck's property, converting several Merck documents to Defendant's branding by simply changing the font and colors from spearmint green (Merck) to orange-red (Defendant). (Am. Compl. ¶ 49). In fact, Farraro openly instructed other employees to change any references in the documents from Merck to Defendant. (*Id.*).

On May 14, 2024, Plaintiff spoke with Weber, an employee in Defendant's Human Resources department about her concerns and filed an official report three days later, on May 17, 2024. (Am. Compl. ¶ 52). Plaintiff reported that Taylor and Farraro had taken proprietary documents from Merck, which she believed contained intellectual property belonging to Merck, particularly as the documents repeatedly referred to Merck's internal data and contained references to divisions that did not exist at Defendant. (*Id.*). Weber delayed submission of Plaintiff's complaint for more than one month, informing her that it was submitted on June 19, 2024. (Am. Compl. ¶ 54). One week later, on June 26, 2024, Defendant informed Plaintiff it was terminating her employment. (Am. Compl. ¶¶ 57, 62). Notably, on September 30, 2024, Defendant informed Plaintiff that its investigation concluded that Merck materials were used by Taylor and Farraro. (Am. Compl. ¶ 65).

Assuredly, this comprehensive timeline is sufficient to meet the pleading standard, which, again, requires only enough to raise a reasonable expectation that Plaintiff had a reasonable belief that Taylor and Farraro misappropriated Merck's trade secrets, *see Trzaska*, 865 F.3d at 162, as prior decisions have approved pleadings far less detailed than Plaintiff's.

For example, in *Hussain v. Allies, Inc.*, No. A-1532-23, 2025 WL 1156055 (N.J. Super. Ct., App. Div. Apr. 21, 2025), the plaintiff alleged that Direct Support Professionals ("DSPs"), who she was responsible for assisting, "mentioned to her they were not trained to take a resident's blood sugar, a task DSPs were responsible for" but did not "assert which DSPs voiced these

11

concerns to her or when." *Id.* at *2. Reversing the lower court's dismissal of the complaint, the court found that this allegation appropriately plead a reasonable belief that the defendant violated a law requiring that the DSPs receive "medication training" because "[t]raining DSPs to monitor blood sugar may arguably be considered medication training . . . [as] the results may require the administration of insulin." *Id.* at *4-*5. As demonstrated by the double qualification, "arguably" and "may," the court took quite the inferential leap in finding the complaint "worthy of surviving the pleading stage." *Id.* at *5.

Similarly, in *Griffin v. Metromedia Energy, Inc.*, No. 10-cv-3739, 2011 WL 12872504 (D.N.J. Feb. 7, 2011), the plaintiff alleged "he 'became aware that the [defendant] was fraudulently overbilling customers for its products' through manipulation of its billing systems," *id.* at *1, and, therefore, "the billing practices 'violated several laws and public policies including, but not limited to, the laws and regulations which prohibit fraud and deceitful business practices." *Id.* at *3. Notwithstanding the fact that the plaintiff did not identify when or to whom he "objected to and opposed the fraudulent billing practices," the court concluded, with minimal discussion, that the plaintiff's allegations "easily" satisfied the first prong of the CEPA. *Id.*

Likewise, in *Greenman v. City of Hackensack*, No. 15-cv-3274, 2016 WL 831794 (D.N.J. Mar. 2, 2016), the plaintiff asserted that, during a meeting of the New Jersey Department of Community Affairs, "she stated that the City of Hackensack was misappropriating funds." *Id.* at *2. Finding that it was "not a stretch to say that misuse of public funds could violate public policy, or could be fraudulent," the court found this allegation sufficient at the pleading stage. *Id.* at 3.

Lastly, in *Meyers v. Board of Educ.*, No. 07-cv-5058, 2010 WL 4387503 (D.N.J. Oct. 29, 2010), despite finding the plaintiff's assertions "that he made 'complaints about certain individuals being employed-or having "no show jobs" in violation of state law, code, and regulation, as well

as federal law,"' were "generalized," the court determined that this statement was enough to establish an objectively reasonably belief on summary judgment. *Id.* at *13. Accordingly, there is no basis to grant Defendant's motion to dismiss Plaintiff's CEPA claim.[9]

## CONCLUSION

Wherefore, for the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss.

Dated: New York, New York
July 21, 2025

                                            **MESIDOR PLLC**

By:   /s/Crystal Pettiford
        Crystal Pettiford
        *Attorneys for Plaintiff*
        110 E 25th St
        New York, NY 10010
        (315) 847-5174
        cp@marjoriemesidor.com

---

[9] The analysis of Plaintiff's alternative common law *Pierce* claim is not materially different. While *Pierce* requires the employee to prove that their "discharge violated a clear mandate of public policy," such as embodied in legislation, *Tartagalia*, 197 N.J. at 110, 112, the question of whether there was an actual violation is determined later in the litigation process. *Trzaska*, 865 F.3d at 162. Thus, for the purposes of this motion, there are no differences between these claims.